IN THE DISTRICT COURT FOR STEPHENS COUNTY
STATE OF OKLAHOMA

FILED DISTRICT COURT
Stephens County, Okla.

FEB 09 2023

MELODY HARPER
Court Clerk

(1) JOSETTE FORD, Administrator for the Estate of MICHAEL FORD, Deceased,

    Plaintiff,

v.

(2) BOARD OF COUNTY COMMISSIONERS FOR STEPHENS COUNTY, OKLAHOMA;

(3) WAYNE MCKINNEY, in his official and individual capacity as Sheriff of Stephens County;

(4) WALTER KASSANAVOID, in his individual capacity;

(5) TURN KEY HEALTH CLINICS, LLC,

    Defendants.

Case No. CJ-2022-103R

ATTORNEY LIEN CLAIMED
JURY TRIAL DEMANDED

## AMENDED PETITION

Plaintiff Josette Ford, as Administrator for the Estate of Michael Ford, by and through counsel of record, Richardson Richardson Boudreaux PLLC and Bryan & Terrill Law, PLLC, hereby submits this Amended Petition against Defendants, and informs the Court as follows:

### I.   NATURE OF ACTION

1. Plaintiff brings this civil rights action for damages resulting from the unnecessary death of Michael Ford at the Stephens County Jail (SCJ). Michael was 57-years old who was awaiting trial. Because he lacked sufficient funds to post bond, he was forced to await trial at the

**EXHIBIT 4**

Jail where he was unable to come and go freely and depended entirely on the Defendants for his welfare and safety.

2.  While Michel was held at the Jail, the Board of County Commissioners, Sheriff, jailers, and Turn Key, the medical services provider, all violated numerous laws and jail standards while Michael Ford was in their custody implicating both the physical plant and facility operations. As a direct and proximate result of these violations, Defendants deprived Michael Ford of his constitutional rights in a manner that resulted in his brutal murder on August 12, 2021. This unnecessary tragedy caused Michael Ford to suffer immense pain prior to his death.

## II.   PARTIES, JURISDICTION, VENUE

3.  Plaintiff Josette Ford, individually and as Administrator for the Estate of Michael Ford (hereafter referred to as "Plaintiff" or "Josette Ford"), at all times relevant to the claim(s) alleged herein, resided in Stephens County, Oklahoma.

4.  Board of County Commissioners of the County of Stephens (Board) is the legislative body for Stephens County with the non-delegable duty to provide an adequate physical plant for the SCJ, along with adequate funding for its operation, to include the provision of medical care. As detailed below, Board is responsible for promulgating, creating, implementing, or possessing responsibility for the continued operation of customs or practices that served as the moving force behind the complained of harm.

5.  Wayne McKinney is the elected Sheriff of Stephens County Oklahoma. He is sued in his official capacity (Stephens County). As Sheriff of Stephens County, McKinney is the final policymaker under state law for the operational aspects of the Stephens County Jail (SCJ). Under state law, the Sheriff has a non-delegable duty to provide adequate medical care to the inmate population.

6. Turn Key Health Clinics, LLC, (Turn Key) is a domestic for-profit corporation, and was the private correctional medical contractor that provided on-site medical staff at the SCJ during Michael's stay that is the subject of this lawsuit. At all times relevant hereto, Turn Key, its agents, employees, and members, were independent contractors with Stephens County as defined by the Oklahoma Governmental Tort Claims Act (OGTCA). By contracting with Stephens County as an independent contractor, Turn Key knowingly and voluntarily waived all protections or immunities it might claim under the OGTCA.

7. Walter Kassanavoid (Kassanavoid), at all times relevant to the claims alleged here, resided in Comanche County.

8. Other than Kassanavoid, all Defendants acted under color of state law, and consistent with official written policies or unwritten practices adopted, promulgated, implemented, ratified, and/or approved by Stephens County, Board, and Turn Key while Plaintiff's decedent was at the SCJ, and upon information and belief, no one was disciplined for any reason associated with the death of Plaintiff's decedent, no policies were changed, and no new training was provided.

9. The events giving rise to this litigation occurred within the territorial jurisdiction of this Court which has general subject matter jurisdiction.

## II.   STATEMENT OF FACTS

### A.   MICHAEL'S CONFINEMENT AND CLASSIFICATION AT SCJ

10. On or about June 3, 2021, Michael was arrested and booked into the SCJ.

11. At the time of booking, jail staff was made aware that Michel required the use of a CPAP machine to control sleep apnea, a potentially fatal medical condition diagnosed by a licensed physician.

12. Pursuant to written policies or unwritten practices at the SCJ, a CPAP machine is

considered a weapon and/or facility safety threat because the associated hoses and equipment necessary to operate the device can be used to commit an aggravated assault, or worse, in a very short amount of time.

13. As a consequence of requiring use of a CPAP machine during the overnight hours, Michael was ineligible for general population housing or double-celling pursuant to SCJ written policy or unwritten practice because of the specific risk that an unstable or otherwise malicious cellmate could use the device kill or seriously injure Michael in a very short amount of time.

14. As a result, SCJ staff initially classified Michael and placed him in medical segregation where he was to remain single-celled throughout his stay and trial.

**B.   THE ARREST OF KASSANAVOID**

15. On or around August 6, 2021, deputies arrested Walter Kassanavoid for discharging firearms in a public place and malicious injury to property.

16. When being arrested, Kassanavoid admitted to deputies that he wanted to kill himself and that he had already killed his dog.

17. Upon information and belief, evidence of animal cruelty is used by law enforcement to evaluate the propensity of a person to commit violent acts against another, as set forth in a 2018 publication by the National Sheriff's Association identifying animal cruelty as a "precursor[] to crimes of violence and abuse against people . . . Our research has shown if somebody is harming an animal, there is a good chance they also are hurting or will hurt a human."[1]

18. In 2016, the FBI's National Incident-Based Reporting System (NIBRS) began collecting detailed case information on animal cruelty incidents from participating law

---

[1] *See* https://www.sheriffs.org/NSA-Releases-New-Animal-Cruelty-Resource-for-Law-Enforcement (last accessed Jan. 26, 2023).

enforcement agencies.[2] Designated as a Group A Offense, animal cruelty is defined as: "Intentionally, knowingly, or recklessly taking an action that mistreats or kills any animal without just cause . . ."[3]

19. Kassanavoid admitted he was hearing voices in his head that told him to kill his dog.

20. Kassanavoid also stated that he tried to commit suicide before but could not do it, and he needed to go to Taliaferro (a mental health facility), because he was thinking about shooting himself, and because had already shot his dog because voices told him to.

21. Upon information and belief, Stephens County deputies knew Kassanavoid presented with an untreated psychiatric condition with auditory hallucinations that included calls to violence that Kassanavoid was either unwilling or unable to control.

### C. KASSANAVOID'S CONFINEMENT AND CLASSIFICATION AT SCJ

22. Upon information and belief, road deputies and other law enforcement in the field are required to communicate characteristics of an arrestee to the intake staff at the time of booking, and the information described above is the type of information road deputies would pass on to jail staff.

23. When Kassanavoid was booked into the SCJ, staff assigned him to a suicide cell.

24. After several days, the SCJ and Turn Key declared Kassanavoid fit for other housing and moved him out of the suicide cell on August 11, 2021, but due his unresolved psychiatric condition, Kassanavoid was not housed in general population, but instead assigned to

---

[2] U.S. Department of Justice, Federal Bureau of Investigation, "Tracking Animal Cruelty: FBI Collecting Data on Crimes Against Animals," February 2016, (last accessed Jan. 26, 2023), https://www.fbi.gov/news/stories/-tracking-animal-cruelty.

[3] U.S. Department of Justice, Federal Bureau of Investigation, Uniform Crime Reporting Program, National Incident-Based Reporting System, *NIBRS Offense Definitions,* 2018, (last accessed January 26, 2023), https://ucr.fbi.gov/nibrs/2018/resource-pages/nibrs_offense_definitions-2018.pdf.

Michael's cell, an action that was contrary to Michael's housing restriction.

25.     Upon information and belief, the decision to violate Michael's housing restriction was not inadvertent or accidental, but done knowingly due to chronic overcrowding that has plagued the SCJ for years prior to 2021 and despite Michael's housing restrictions. The chronic conditions further led SCJ and Turn Key to remove Kassanavoid from the psychiatric / suicide wing and place him in Michael's single cell despite his restrictions and the existence of equipment that could be used as a weapon.

26.     Overcrowding is a correctional term of art used to describe a facility population that makes adequate classification more difficult. Overcrowding is distinguished from over-capacity, which describes a facility population that exceeds the rated capacity. A jail can be overcrowded at a facility-level or by special housing units, *e.g.*, women/men, convicted/pretrial, juvenile, and segregation (medical/protective/disciplinary).

27.     Using the facility telephone system, Michael reported to Plaintiff that despite the housing restriction to remain single-celled, SCJ staff placed Kassanavoid in his medical segregation cell.

28.     Plaintiff placed calls to the jail and spoke with staff who confirmed, on two occasions, that Michael was subject to an active housing restriction requiring that he remain single celled.

29.     Jailers who spoke with Plaintiff said they would investigate the matter further.

30.     When Plaintiff called a third time, she was told by an assistant administrator that the jail administrator would run the jail as she saw fit.

D.   **KASSANAVOID BEATS MICHAEL TO DEATH WITH THE CPAP**

31.     On or about August 12, 2021, at approximately 9:15 p.m., a jailer discovered

6

Michael's body laying on the ground inside of his cell.

32. Around 9:24 p.m., backup staff arrived and entered the cell to find Kassanavoid sitting on the top bunk bed in a seated position with blood on his hands, feet, and clothing.

33. A review of the video surveillance camera in the cell shows that at approximately 7:28 p.m., Kassanavoid began to brutally assaulted Michael.

34. Video shows Kassanavoid hitting Michael with his fists and placing Michael in a choke hold and then throwing Michael's body into the wall.

35. Video shows Michael attempting to get away from Kassanavoid by getting near the shower area inside the cell, but to no avail.

36. Video shows Kassanavoid leave Michael on the ground after a prolonged assault.

37. Video shows Kassanavoid resuming the beating using Michael's blue rectangular CPAP.

38. Video shows Kassanavoid drag Michael across the cell where he used his foot to repeatedly stomp Michael's head, neck, and face.

39. The assault ended around 7:40 p.m. with Michael splayed across the floor of the cell.

40. SCJ staff did not enter the cell until 9:24 p.m., approximately two hours after Kassanavoid initiated the violent assault.

41. Kassanavoid admitted to investigators that he attempted to kill Michael the day before using the hoses from the CPAP machine.

42. Michael Ford passed from the injuries inflicted on August 12, 2021.

43. Upon information and belief, staff of SCJ and Turn Key did not do the required cell checks despite industry practices, the known psychiatric issues of Kassanavoid and the existence

of equipment that could be used as weapons within the cell.

44. SCJ and Turn Key, with deliberate indifference, placed a dangerous inmate, Walter Kassanavoid, into Michael's cell while knowing that Walter Kassanavoid was an extremely dangerous and unstable inmate and that Michael was to be single-celled due to the likelihood that his CPAP could be used as a weapon.

45. SCJ and Turn Key, with deliberate indifference, placed a dangerous inmate in Michael's cell while Michael had his CPAP machine, which can be, and was used, as a lethal weapon.

46. Jail standards require that each location where prisoners are confined "shall be equipped with an intercommunication system that terminates in a location that is staffed twenty-four (24) hours-a-day and is capable of providing an emergency response."

47. When Kassanavoid assaulted Michael and beat him death, there was no intervention from Defendants.

48. Staff did not even come to the cell or notice a body for almost two (2) hours.

E. **SYSTEMIC PROBLEMS AT THE STEPHENS COUNTY JAIL**

49. Upon information and belief, Board failed to provide adequate funding for the safekeeping of persons, allowed the jail to be overpopulated, and did not properly supervise the Sheriff, deputies, jailers and medical providers at its facility.

50. Board and Sheriff were very aware for years, at least since 2014, that the jail was overcrowded. In fact, Sheriff stated publicly that he was not surprised state inspectors warned he and the Board of the overcrowding issue but was instead surprised the warning had not come sooner.

51. Board and Sheriff were further aware that despite the overpopulation the jail was underfunded and understaffed to address the issues posed by an overcrowded jail.

52. In fact, Sheriff told Board that the "situation [was] extremely serious" and that the jail was operating with bare-bone necessities.

53. The Board further recognized that one people were placed in the jail they were "required to take care of them, period."

54. The issues of underfunding and overcrowding continued, but the Board refused to award additional funding even after being advised that sales tax revenue was being improperly routed to juvenile corrections.

55. Sheriff advised the Board that there was a major problem in that he was being asked to run the jail but was not given the tools to do so like he ran his office.

56. The major problems continued into 2021 with the Sheriff informing the Board that more money was needed for salaries for existing jail staff and to aid in recruiting new detention officers while retaining current employees.

57. The jail, however, was still operating at a deficit and without a working budget.

58. The jail was intended to house a population of up to 162 inmates, but routinely housed as many as 247 inmates with the population in pods sometimes being double the capacity with inmates having to sleep on the floor of cells and as many as four inmates in one cell.

59. The jail administrator has even stated that since the jail was built to only house 162 inmates, inmates had be constantly shuffled and rearranged to attempt to house specific inmates together or separately.

60. The game of inmate musical chairs was necessary due to overcrowding and the dwindling number of accommodations.

61. Despite this rampant overpopulation and lack of accommodations, which had been recognized as "an emergency situation," the Board and Sheriff failed to properly fund the jail, to develop a working budget, to hire, to retain and utilize sufficient staff.

62. The policies or practices adopted and accepted by Stephens County and Sheriff served as a moving force behind the injuries and damages suffered by the Estate and was coupled with reckless and deliberately indifferent conduct.

### III.  STATEMENT OF CLAIMS

#### FIRST CLAIM FOR RELIEF: ASSAULT
#### (against Walter Kassanavoid)

63. Plaintiff incorporates the above paragraphs as though stated below verbatim.

64. On August 12, 2021, Defendant Kassanavoid acted with the intent of making a harmful and/or offensive contact with Plaintiff's decedent, Michael Ford. Defendant further acted with the intent of putting Michael Ford in apprehension of such a contact.

65. As a result of Defendant Kassanavoid's conduct, Michael Ford was placed in apprehension of an immediate harmful and/or offensive contact with his person by Defendant. Plaintiff was caused to suffer fright as a result.

66. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages in an amount in excess of Ten Thousand Dollars ($75,000.00).

#### SECOND CLAIM FOR RELIEF: BATTERY
#### (against Walter Kassanavoid)

67. Plaintiff incorporates the above paragraphs as though stated below verbatim.

68. On August 12, 2021, Defendant Kassanavoid, without the consent of Plaintiff's decedent, Michael Ford, acted with the intent of making a harmful and/or offensive contact with

Michael's person. Defendant further acted with the intent of putting Michael in apprehension of such a contact.

69. Defendant's actions resulted in a harmful contact with Michael.

70. As a direct and proximate result of Defendant Kassanavoid's conduct, Plaintiff suffered damages in an amount in excess of Ten Thousand Dollars ($75,000.00).

### THIRD CLAIM FOR RELIEF:  WRONGFUL DEATH & NEGLIGENCE
(against all Defendants)

71. Plaintiff incorporates the above paragraphs as though stated below verbatim.

72. Defendants' actions and omissions as set forth above were negligent, willful and/or reckless in nature.

73. Defendants negligently and recklessly failed to provide Michael with safe pretrial detention.

74. Defendant SCBCC, Turn Key, and Sheriff McKinney are liable for the actions of their employees and agents as they were committed in the course and scope of employment.

75. Such reckless conduct by the Defendants resulted in the death of Decedent and arises to the level of Wrongful Death under Oklahoma law, specifically, Okla. Stat. tit. 12 O.S. § 1053.

76. As a direct and proximate result of Defendants' negligent and/or reckless conduct, Michael died after extreme pain and suffering. Plaintiff seeks, and is entitled to, actual, compensatory and punitive damages (where statutorily permitted), as well as all other relief and damages recognized in Okla. Stat. tit. 12 § 1051, et seq. all in an amount in excess of excess of Seventy-Five Thousand Dollars ($75,000.00).

### FOURTH CLAIM FOR RELIEF:  FAILURE TO PROTECT
FOURTEENTH AMENDMENT
42 U.S.C. § 1983

**(against SCBCC, Turn Key, and Sheriff McKinney)**

77. Plaintiff incorporates the above paragraphs as though stated below verbatim.

78. The practices, policies and customs of Defendants SCBCC, Turn Key and Sheriff described above are either persistent, widespread, and so common and well-settled as to constitute a custom that fairly represents municipal policy, or they are consistent with official written policy adopted or promulgated by those with final policymaking authority.

79. These unwritten practices or written policies were enforced and maintained despite actual or constructive notice that the policy or practice of functioning overcrowded and shuffling inmates throughout the jail facility, including placing inmates into cells of inmates with housing restrictions, created a substantial risk of harm, and the policies or practices referenced above served as the moving force behind the deprivations suffered by the Estate for which Defendants are liable.

80. Michael Ford had a clearly established due process right to bodily integrity to be free from inmate-on-inmate violence.

81. Defendants deprived Mr. Ford of that right by adopting and ratifying policies and/or practices that substantially increased the risk of harm, by:

    a. Housing those with mental health issues (Kassanavoid) with non-violent individuals (Michael Ford);

    b. Failure to adequately staff the jail;

    c. Failure to follow policies and systems to ensure that detainees had no risk of injury with the necessary medical devices they need;

    d. Failure to adequately train and supervise the staff to monitor the jail cells and surveillance of the cells to prevent inmate-on-inmate violence;

    e.    Failure to ensure weapons or items that can be used as weapons are not placed in cells with two inmates housed together;

    f.    Failure to properly evaluate, assign and house individuals in custody.

82.    Defendants enacted, ratified and/or enforced these policies or practices with indifference to the consequences.

83.    The acts or omissions of the Defendants violated the Fourteenth Amendment rights of Mr. Ford, actionable through 42 U.S.C. § 1983, for which the Defendants are liable to the Estate.

### FIFTH CLAIM FOR RELIEF: FAILURE TO PROTECT
### ART. 2 § 7
### *BOSH* CLAIM
### (against SBCC, Turn Key, and Sheriff)

84.    Plaintiff incorporates the above paragraphs as though stated below verbatim.

85.    Defendants were aware of Defendant Kassanavoid's state of mind, risk of harm and/or violent tendencies.

86.    Despite having that knowledge, Defendants still cleared Kassanavoid from his psychiatric cell and placed Defendant Kassanavoid into the same cell as Plaintiff.

87.    Further, despite having the knowledge of above, Defendants allowed Michael Ford to have a CPAP machine in the cell while housing him with Defendant Kassanavoid, all the while knowing the CPAP could easily be used as a weapon.

88.    The CPAP machine was used as a weapon against Plaintiff by Defendant Kassanavoid when they were celled together.

89.    Defendants had a policy to not place items in shared cells that could be used as weapons.

90. Defendants also had policies in place to segregate those who are suicidal, dealing with mental health issues, or other medical and/or psychological issues, especially when they have the tendency to harm others or had medical equipment needs.

91. Defendants have a custom of not following their policies, by placing inmates in cells with other inmates who are suicidal, have tendencies to harm others, or are dealing with medical and/or psychological issues. Further, Defendants have a custom of not following their policies in removing items that could be used as weapons when inmates are housed together.

92. Defendants have a policy of shuffling inmates throughout the jail due to systemic overcrowding throughout the jail.

93. Defendants had a duty to protect and failed to protect Michael Ford.

94. Because of the actions and inactions of Defendants, Plaintiff suffered great injuries and damages, resulting in Michael's death.

**SIXTH CLAIM FOR RELIEF: INADEQUATE SUPERVISION**
**FOURTEENTH AMENDMENT**
**42 U.S.C. § 1983**
**(against SBCC, Turn Key, and McKinney)**

95. Plaintiff incorporates the above paragraphs as though stated below verbatim.

96. As set forth above, Board of Commissioners, Turn Key, and/or McKinney, with deliberate indifference to the lives and well-being of prisoners in their custody, adopted, enforced, ratified, and maintained written policies and/or unwritten practices at the Jail, or alternatively acquiesced in their use, that caused conditions of confinement that, individually and collectively, served as the moving force behind Michael Ford's death.

97. On account of the above, Board of Commissioners, Turn Key, and/or McKinney are liable to Plaintiff pursuant 42 U.S.C. § 1983. The specific deficiencies include, but are not limited to, the failure to conduct adequate welfare checks of persons at risk, failure to separate

those detainees who should not be together or should be isolated, failure to even be at the jail to ensure deputies are adequately completing their job, and failure to ensure that deputies were trained to adequately do their job.

## SEVENTH CLAIM FOR RELIEF: INADEQUATE SUPERVISION
### ART. 2 § 7
### *BOSH* CLAIM
### (against SCBCC, Turn Key, and Sheriff)

98. Plaintiff incorporates the above paragraphs as though stated below verbatim.

99. As set forth above, Board of Commissioners, Turn Key, and/or McKinney, with deliberate indifference to the lives and well-being of prisoners in their care and custody, adopted, enforced, ratified, and maintained written policies and/or unwritten practices at the Jail, or alternatively acquiesced in their use, that caused conditions of confinement that, individually and collectively, served as the moving force behind Michael Ford's death.

100. On account of the above, Board of Commissioners, Turn Key, and/or McKinney are liable to the Estate pursuant Art. 2 § 7. The specific deficiencies include, but are not limited to, the failure to conduct adequate welfare checks of persons at risk, failure to separate those detainees who should not be together or should be isolated, failure to ensure deputies are adequately completing their job, and failure to ensure that deputies were trained to adequately do their job.

## Eighth Claim for Relief: Conditions of Confinement
### Fourteenth Amendment
### 42 U.S.C. § 1983
### (against SCBCC, Turn Key, and Sheriff)

101. Plaintiff incorporates the above paragraphs as though stated below verbatim.

102. Board of Commissioners, Turn Key, and/or McKinney, with deliberate indifference to the lives and well-being of prisoners in their custody, adopted, enforced, ratified, and maintained written policies or unwritten practices at the Jail, or alternatively acquiesced in their use, that

15

caused conditions of confinement that, individually and collectively, served as the moving force behind Michael Ford's death, for which, Board of Commissioners, Turn Key, and/or McKinney are liable to the Estate pursuant 42 U.S.C. § 1983.

103. The specific conditions include, but are not limited to: inadequate staffing, training, and supervision of staff; and inadequate policies to ensure detainees are safely housed with other detainees or in isolation, taking into consideration their medical needs and the equipment necessary for those needs.

### NINTH CLAIM FOR RELIEF: CONDITIONS OF CONFINEMENT
### ART. 2 § 7
### *BOSH* CLAIM
### (against SCBCC, Turn Key, and Sheriff)

104. Plaintiff incorporates the above paragraphs as though stated below verbatim.

105. Board of Commissioners, Turn Key, and/or McKinney, with deliberate indifference to the lives and well-being of prisoners in their custody, adopted, enforced, ratified, and maintained written policies or unwritten practices at the Jail, or alternatively acquiesced in their use, that caused conditions of confinement that, individually and collectively, served as the moving force behind Michael Ford's death, for which, Board of Commissioners, Turn Key, and/or McKinney are liable to the Estate pursuant Art. 2 § 7.

106. The specific conditions include, but are not limited to: inadequate staffing, training, and supervision of staff; and inadequate policies to ensure detainees are safely housed, with other detainees or in isolation, taking into consideration their medical needs and equipment necessary.

### TENTH CLAIM FOR RELIEF: INADEQUATE TRAINING
### DELIBERATE INDIFFERENCE
### 42 U.S.C. § 1983
### (against SCBCC, Turn Key, and Sheriff)

107. Plaintiff incorporates the above paragraphs as though stated below verbatim.

108. As set forth above, Board of Commissioners, Turn Key, and/or McKinney, with deliberate indifference to the lives and well-being of prisoners in their custody, adopted, enforced, ratified, and maintained written policies or unwritten practices at the Jail, or alternatively acquiesced in their use, that caused conditions of confinement that, individually and collectively, served as the moving force behind Michael Ford's death, for which, Board of Commissioners, Commissioners, and/or McKinney are liable to the Estate pursuant 42 U.S.C. § 1983.

109. The specific training deficiencies include, but are not limited to, failure to provide training to conduct adequate welfare checks, failure to train staff to handle those with medical needs or medical equipment, failure to train physical and/or video cell checks and monitoring, and failure to train to ensure staff properly and honestly documented and logged the their activities and those of segregated persons at risk.

### ELEVENTH CLAIM FOR RELIEF: SUPERVISORY LIABILITY
### DELIBERATE INDIFFERENCE
### 42 U.S.C. § 1983
### (against SCBCC and Sheriff)

110. Plaintiff incorporates the above paragraphs as though stated below verbatim.

111. Commissioners and/or McKinney, with deliberate indifference to the lives and well-being of prisoners in their custody, failed to adequately supervise staff at the Center, or alternatively, acquiesced in a lackadaisical approach to operational management that was so lacking in meaningful supervision and discipline that it was the functional equivalent of no supervision at all, and which were the moving force behind Michael Ford's death, for which Commissioners and/or McKinney are liable to the Estate pursuant to 42 U.S.C. § 1983.

112. The specific deficiencies supporting supervisory liability include, but are not limited to, the failure to ensure the provision of adequate welfare checks, the failure to ensure the deputies were adequately prepared and had adequate knowledge of operations at the jail, the failure

to discipline staff for excessive and unnecessary violations of policy and operations, the failure to discipline staff for not conducting sight checks or welfare checks, and McKinney completely failing to be at the jail for long periods of time.

## PUNITIVE DAMAGES
### (Only Against Sheriff, in his individual capacity, and Turn Key)

113. Plaintiff hereby incorporates the preceding paragraphs in their entirety as though stated below verbatim.

114. The acts and omissions by Defendants Turn Key and Sheriff, in his individual capacity, as set forth in the preceding paragraphs in this Petition demonstrate that Defendants engaged in conduct and/or practices evincing malice and/or reckless indifference to Decedent's rights.

115. As a direct result of Defendants' malice and/or reckless disregard for Decedent's rights, Plaintiff is entitled to exemplary and punitive damages in an amount to be determined at trial commensurate with the financial resources available to Defendants and sufficient to deter others similarly situated from like behavior and as is allowed by law.

## RELIEF REQUESTED

116. Based on the foregoing, Estate respectfully requests the following relief:

   a. Compensatory damages against all Defendants;

   b. Actual damages against all Defendants;

   c. Punitive damages against Defendants Sheriff, in his individual capacity, and Turn Key;

   d. Declaratory relief that Defendants' acts or omissions deprived Michael Ford of his constitutional rights;

   e. Nominal damages against all Defendants;

  f. Statutory damages, including those available under 12 O.S. § 1053;

  g. Reasonable costs and attorney fees;

  h. All pre-judgment and post-judgment interest; and

  i. Any other legal or equitable relief to which the Estate is entitled

WHEREFORE, Plaintiff respectfully prays the Court grant judgment in her favor against Defendants in an amount in excess of $75,000.

        Respectfully submitted,

        /s/ Charles L. Richardson
        Charles L. Richardson, OBA No. 13388
        Jason C. Messenger, OBA No. 19887
        Colton L. Richardson, OBA No. 33767
        **RICHARDSON RICHARDSON BOUDREAUX**
        7447 S. Lewis Ave.
        Tulsa, OK 74136
        (918) 492-7674

        ***And***

        BRYAN & TERRILL

        J. Spencer Bryan, OBA # 19419
        Steven J. Terrill, OBA # 20869
        BRYAN & TERRILL LAW, PLLC
        2500 S. Broadway, Suite 122
        Edmond, OK 73103
        Tele/Fax: (918) 935-2777
        sjterrill@bryanterrill.com

        *Attorneys for Plaintiff*